Mr. Galvan's sentence and conviction must be reversed and vacated for four independent reasons. I'd like to start with the first one in our brief, which is how Judge Miller, the District Court judge, violated Mr. Galvan's Sixth Amendment rights to confrontation by improperly restricting the scope of cross-examination and the use of force. And Well, Your Honor, it's true. We were able to skirt around the issue, so to say, and through, I would say, scope of cross-examination, get some questions through. And I would argue that that only would bolster our case that we needed to discuss the origins of this report further in depth to show bias, things of that nature, on the part of specifically Agent Hayes. Now, to answer your question more directly, the Report B, which I'll refer to as Exhibit B, because that's what it's referred to in the record. Now, we have Exhibit A, which was a report of investigation, which was generated immediately after Mr. Galvan was arrested and arraigned in federal court in San Diego. That was in March of 2006. Now, the case is set for trial in August of 2006. Shortly before trial, we receive Report B, Exhibit B. Now, Exhibit B, seemingly on its face, looks the same as Exhibit A, the report that was turned over in March. But if you look closely, there are different facts contained in the body of the reports, and there's also an addendum from Agent Hayes, who was one of the two agents that arrested Mr. Galvan. Now, those changes specifically went towards a charge that Mr. Naras filed the day after we received this report in August, which was attempted entry after deportation. The changes were that Mr. Galvan said that he had a green tie. Now, that specifically goes towards the specific intent element of conscious desire to enter the United States. Before, when Mr. Galvan was discharged with attempted entry after deportation, and the report only said that he was a Mexican citizen that did not have papers, we had a defense. We have a gentleman who's out in the woods, who's out in the field, the desert, however you want to call it. There's no markers at the border of any sort, and he's carrying a Bible. Specifically, at Exhibit Record 180, Agent Hayes said that Mr. Galvan said he was just out walking. Now, under that charge, the government has to prove that Mr. Galvan knew that he was in the United States, that he knowingly and voluntarily entered. When they supersede the indictment to charge an attempt, conscious desire to enter the United States, and then we have facts in a second report that say that he had a green card, which shows the mental state of trying to elude these agents, trying to perpetrate a fraud on these agents, something is suspicious. But you brought all that out in the trial, didn't you, Don? We were able to bring that out on some of the witnesses, but not Agent Hayes. I was able to bring out the green card issue with Agent Perez, who was the AFAL custodian. We were never able to directly ask Agent Hayes about the genesis and origin of the second report. But wasn't the court's ruling based upon the fact they'd never seen the report before? Judge Miller did say that. How could he comment on that if he'd never seen it before? Well, that's suspicious in and of itself, Your Honor, too, respectfully. You have Agent Hayes saying that he's writing an addendum to a report that he's never read. And he took great pains to say that he had never read this report, he was in a different room, that he wrote this addendum on his own once he found out charges were being filed. That really doesn't make any sense. Addendum, by definition, means you're adding something to something else. Now, if you're going to add something to something else, that means you have to read the original to begin with, because you don't know what you're adding. Now, we get this second report that has an addendum and it has changes, something doesn't add up. Now, you add in the fact that the government changes the indictment, supersedes, adds a mental state requirement, which is bolstered by the fact of the second report in the addendum, and we should be able to cross-examine on that, especially when it takes a while. You did cross-examine, didn't you? As I said before, we were able to skirt around the issue because Judge Miller specifically confined us to differences between the testimony and what was in the report, not the origins of the report. But with all due respect, counsel, I think you did a great job in getting around this issue. But I'm really puzzled as to what you did not get in the record that resulted from this denial by the judge here. He gave you wide latitude to question all around this, to ask people about what they knew. You raised the difference. It was all flagged. Where's the harm? Well, Your Honor, I think it highlights our argument. We went around the issue. We didn't go directly, we weren't able to go directly at the issue, which is that there's bias on behalf of Judge Hayes, or not Judge Hayes, Agent Hayes. Now, I believe if we were able to explore that, the difference in the outcome would have been substantially different. You have a bunch of agents who testified that they don't really remember the events that happened. They arrest hundreds of thousands of people in their jobs at Border Patrol, hundreds of months, thousands of months. They encountered it. They specifically rely on these reports to refresh their recollection, to recall what happened. Now, the suspicious nature of the second report that all the witnesses, Agent Corkin, Agent Hayes, and Agent Lubin, as well as Agent Perez, relied on tainted the whole trial.  I'm sorry? Weren't you raised to claim a bias of these folks? I was, but I think, and Your Honor said that we were able to skirt the issue and we were able to get as much out as we could. Right. Now, I think that only offers a glimpse into what we could have gotten if we would have been able to directly ask Agent Hayes further questions. So you're asking this court to, in effect, find harm based upon what we think you might have been able to get from, say, Agent Hayes, whose credibility and whose bias, et cetera, et cetera, you examined at great length in the court. Is that correct? That's sort of the argument, Your Honor. That is. But it also goes towards the credibility of all the other agents. Now, if Agent Hayes doctored this report, now, I don't have proof of that, but let's say that that's our suspicion, that Agent Hayes doctored the report. That affects not only his credibility, but the credibility of Agent Corkin and Agent Lubin. Is that a standard that at the court of appeal level that we should rely upon, your suspicion that he doctored the report, even though he got to ask questions all about the alleged deficiencies of these agents? Your Honor, in our brief, we cite some cases. And there's one case, which the name of it eludes me right now, but the case that's in our brief, it says that the defense was even able to ask, are you biased of a witness? And that was not enough. That was not enough. They specifically asked. There was another case where they entered a plea agreement that showed bias. That was not enough. So here, where we weren't even able to get into the issues of whether this agent was biased or not, we were only able to ask him about direct inconsistencies between his testimony and the report. I think it's far short of even that on that issue. If your Honors have no further questions on that issue, I'll move on to our next one. Our second issue is that the district court erred when they admitted evidence of a second subsequent removal, which was a removal from 2004. There was two removals that were admitted at trial over defense abjection, one from 2003 and one from 2004. We would state that Rule 404B prohibited the admission of the second removal. The government admitted that because they said that they had to prove that Mr. Galvant actually had left the country. But it was nothing more than pure propensity evidence and prejudicial. Going back to the ---- Doesn't this particular exclusion, though, that you're arguing, form an essential element of the charge defense? I'm unsure of your Honors' question. Well, maybe I misunderstood your comment. I thought you were arguing under 404B that the district court did commit prejudicial error by admitting evidence of his 2004 removal. Did I misunderstand you? No. They did commit error by allowing this removal to be presented to the jury, the second removal, the 2004. Okay. And my question is, 404B doesn't exclude evidence forming an essential element of the charge defense. And in this case, the fact of the removal is an element of the charge defense, isn't it? But they already had a removal from 2003. But it had been challenged in some respect. That ---- I understand what Your Honor is saying because that's the government's argument. And Judge Miller even misconstrued that. If you look at the record, Judge Miller says to me, he says, is deportation an element of this case or is deportation an issue in this case? That's on ER-231. I say, no, Your Honor. Now, further, when this was being discussed on ER-231, I said the theory of this case will be, and then Judge Miller cuts me off, that there was never any physical removal. I say we will question agents regarding their recollection of this. Now, we had two defenses. One, that Mr. Galvan did not have the specific intent, the conscious desire to enter the United States. Two, that the agent's recollections of these events were faulty based on paperwork that the government had prepared, reports. This goes back to Agent Corkin all the way through to the end agent. We were questioning the memory of Agent Meeker, whether he could remember this. And it's in the record that Mr. Fife questioned him, and he couldn't remember it. That is separate and distinct from challenging that the actual removal didn't happen. That's a different issue. To get back to the other point that Judge Holland raised, though, I think you said to him that the exclusion that I mentioned before, that if it's an essential part of the element, there's no basis for exclusion. He asked whether that wasn't being challenged. You said they had the 2003. Does the fact that it may be duplicative change the rule? Well, I believe that it just shows propensity, and it goes to undue prejudice in this case. If you go back to jury selection, we included some of that. Did you argue that in your brief, that it was undue prejudice? Yes, sir. By re-arguing it? By re-arguing? By arguing that by referring to yet another removal that that was prejudicial. Yes, yes. We said it was more prejudicial than probative, and that it was entirely cumulative because they already had one in evidence, as well as the fact that it went towards nothing other than propensity, that this gentleman has a propensity to come back. Now, it also goes towards the mental state of Mr. Galvan, whether he knows he's here or not. If they're trying to show that this gentleman keeps coming back to the United States, that also goes to that. Now, it was entirely unnecessary for them to present this evidence, seeing as they already had a removal that was admitted, and they had an agent testifying to it. And that's different than the cases that are cited, Martinez-Rodriguez, where there was no other alternative, apparently, in that case. Here they had a warrant of deport with a picture on it, a signature on it, and they had a recipient witness who could testify to it. Does Your Honor have any further questions on this issue? Your Honor, our third issue that we'd like to talk about today is the jury instructions. Specifically, I would address two of them that were denied. One would be the overt act instruction that the attempt to be knowing and voluntary. Judge Miller actually agreed with us that this needed to be highlighted, but, however, instead of making it a separate jury instruction, he's put it in with the theory of defense instruction, which I would say prejudiced us because the juries instructed that arguments are not evidence. So that became nothing more than an argument of the defense, other than a statement of law, which it is under Salazar-Gonzalez. Moving to the second one. We're at the magic five-minute marker here, so you want to save five for rebuttal. Thank you, Your Honor. So we'll hear now from the government, or rather the prosecutorial side of the government. Good morning. May it please the Court. William Neres for the United States. Your Honor, I have three points to make on the issue of cross-examination. The first is Judge Miller's ruling was absolutely correct, that no foundation existed to question Agents Hayes or Agent Lubin regarding a report that they'd neither seen nor drafted. The second is that even were Your Honors to conclude that such cross-examination could occur, the substantive evidence came in in the form of cross-examination of Agent Perez at a later date in the trial, when the defense was permitted to ask him about the exact differences between the report and highlight those for the jury. The third is this is not a case where all inquiry on a matter was limited, such as the cases of Larson, United States v. Larson, the recent en banc case, or the Fowler v. Sacramento County case, where the Court ruled that a confrontation clause violation had occurred because all inquiry was limited, as opposed to questions within a specific area. Returning to the first question, there was a suppression hearing in this case the day before trial, at which time Agent Hayes and Agent Lubin testified. Both of them testified that they had not read this report, nor had they drafted this report. Judge Miller properly alerted defense counsel to the problem of the foundation for any cross-examination the following day, should it come to that. The following day, Agents Lubin and Hayes were presented with this version of the report they had never seen nor drafted, and they were asked about statements in there. Judge Miller properly cut off cross-examination at that point and informed defense counsel that without a foundation, questions about the report were not proper. Later on in the trial, there was a brief break when Judge Miller revisited the issue with defense counsel and permitted him to discuss with Agent Perez whether the differences existed and the extent of the differences between the reports. The third point I would like to make here is with respect to the charging decisions that were made and the timely disclosure of this. There was not a motion to strike this testimony based on late discovery, not a motion to compel discovery in the form of the reports being held back. Quite simply, what happened was, as is set out in the government's brief at footnote 4, Agent Hayes testified that when he arrests someone like this, he drops them off at the Border Patrol station and then he goes on his way, because at that point it's unclear if the person will be prosecuted or processed administratively. Once the decision is made to prosecute, he's informed, he sits at a computer, and he drafts an addendum to the report without looking at the main body of the report. That was brought to our attention. On the eve of trial, two weeks before trial, it was disclosed. The decision to heighten the mens rea to an attempted entry from a found-in case was done in the wake of Salazar-Gonzalez, a case in which this Court ruled that an entry must be knowing and voluntary. Because of that and because of where this defendant was arrested, an attempted entry fit more comfortably with the facts of the case than a found-in, and so the government returned to the grand jury to seek a superseding indictment. So unless Your Honors have further questions on that, I'll move on briefly to the other issues that were raised. The first is the removals. Here this case is clearly controlled by United States v. Martinez-Rodriguez at 472 F. 3rd, 1087. There the Court said that it is not 404B if it makes up an essential element of the charge, as Your Honor pointed out a moment ago. And the second point here is that there were differences. These were not identical removals. As defense counsel highlighted, these removals had separate A numbers associated with them. This defendant had four A numbers, three A files. So there were different A numbers on the two removals, as well as the fact that the names actually differed. One was Adrian Johnny Galvan-Lizarraga. I believe the other one was Adrian Galvan-Lizarraga without the Johnny included in there. And finally, just as in Martinez-Rodriguez, in one case the agent testified to the removal process. With the later removal, there was no testimony along those lines. Should Your Honor find the duplicative admission of these to be problematic, I would refer to United States v. Wayland, which is the case with the felon in possessions, where four identical felonies were admitted where there was refusal to stipulate. And the Court characterized that as a close issue. I think the maxim is superfluity does not vitiate. I would agree. And finally, on the jury instructions, I would just point out, with respect to the Overt Act, that the knowing and voluntary instruction, it relates to the general intent crime and not the specific intent crime of an attempted reentry. And if there are no further questions. Thank you for your presentation. We'll hear now from Mr. Krause for his rebuttal. Thank you, Your Honor. Your Honor, I alluded to two cases, one about bias. That was Davis, just to augment my record. And the one about the plea grant would have been Schoenberg. Those are both in our moving papers. Your Honor, Mr. Daenerys said a couple of things that I find interesting and I think bolsters my presentation. We were able to get to this with Agent Perez. However, Agent Perez was not the witness to the question. Agent Hayes was the witness to the question. He was the one who we believe doctored these reports or changed the reports in some way, but denied even reading the original report. So the fact that we were able to ask Agent Perez these questions, he was the wrong witness to ask them to. But you asked lots of things of Agent Hayes, though, right? We were able to. And he wasn't on the stand quite a while. He was. And as Your Honor said, we were able to skirt around the issue and we were able to get some things out. But I would argue that the error is not judged based on what we were able to get out, but what we weren't able to get out. How else are we to divine harmless error if you were able to get everything out of Agent Hayes without including Exhibit B in the evidence? Well, in Davis and Schoenberg's, the two cases that I mentioned before, one, they asked to point out, are you biased? The other one, they entered a plea agreement to a co-conspirator. Those were found not to be harmless. That's where evidence was actually brought in. Here, there was we weren't able to get to the very gravum in the heart of the issue, which is what we needed to do. Mr. Naras said that it's Agent Hayes only writes these addendums after he finds out that there's a prosecution being issued. Now, it's strange that the addendum doesn't show up until after the superseding indictment. What kind of rule would we make if we did what you want us to do? I'm sorry, Your Honor? What rule would we make if we did what you want us to do? When a witness is on the stand and the witness denies knowing about the document that you want to question him about, I haven't seen it, I haven't read it, I know nothing about it, you want some rule that says what? Well, Your Honor, when there's evidence that this witness probably did see this. What was the evidence? Well, his, frankly, his explanation was unplausible. The fact that he would go and he took great lengths. But if it was, then whoever the trifecta is knows that. But, Your Honor. It is implausible. He took great lengths to distance himself from the first report. To say that he wasn't even in the same room, he did this at some later date, this is completely implausible. Like I said, the definition. But what would the rule be? That's not for me to decide, but I do know. I know, but you want us to do something. I'm asking you now, what do you want us to do? I want you to vacate and over, vacate Mr. Gellman's sentence. For what reason? Because the trial court didn't make a man who says, I'm not familiar, I haven't read it, I can't comment. And the trial court. Well, we should be able to. Let you move on. Forgive me, Your Honor. They didn't let you continue to ask him the questions. So what would the rule be? I think we. No matter what they say, if a public defender wants an answer, you've got to give it to him. Your Honor. Would that be the rule? I think in this circumstance, where, as your fellow Justice said, that I was able to skirt the issue and get enough evidence out through skilled cross-examination and through other means, that in that certain circumstance, that we should have been able to ask this witness about the origins of this report, even though he said he had not reviewed it or anything like that, because that was completely implausible given the facts of this case. That sounds like a district court argument. I can understand you're making that argument to me in the midst of a trial saying, Judge, you've listened to all this stuff now. It's time to let me go a little further. It sounds like a district court argument rather than a, rather than an appeal argument. We attempted to make that argument numerous times and were consistently shut down by Judge Miller on this issue, Your Honor. That's why we're here today, because we truly believe that if we were able to explore this issue in further depth and show the bias and lack of credibility on behalf of Agent Hayes, as well as the other witnesses who relied on Agent Hayes' report, then the outcome in this case would have been extremely different, because it would have put a pall of reasonable doubt over the entire trial. And I see that I have ten seconds left, so I thank you, Your Honor, for your time. Thank you both for your arguments. The United States v. Galvan-Lizarraga is submitted.
judges: Farris, Smith, Holland